UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

EDWARD JAMES McKINNEY                    CIVIL ACTION NO. 08-cv-1263

VERSUS                                   JUDGE HICKS

WARDEN, LOUISIANA STATE                  MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Edward James McKinney ("Petitioner") of the second degree murder of an innocent bystander who was shot in the head during a gang-related exchange of gunfire.  The conviction and mandatory life sentence were affirmed on direct appeal.  State v. McKinney, 890 So.2d 737 (La. App. 2d Cir. 2004), writ denied, 902 So.2d 1050 (La. 2005), reconsideration denied, 916 So.2d 152 (La. 2005).  Petitioner also pursued a state court post-conviction application.  He now seeks federal habeas corpus relief.  For the reasons that follow, it is recommended that the petition be denied.

### Dismissed or Abandoned Claims

Petitioner's application listed several claims under the category-headings of I through V.  The court called into question whether some of the claims had been exhausted in the state courts. Petitioner responded by agreeing to dismiss without prejudice Claim I(D) (certain objections not recorded), I(F) (all bench conferences not recorded), II(E) (introduction of photograph of victim), III (all three subsections that argued ineffective assistance of trial

counsel), IV (ineffective assistance of appellate counsel), and V (cumulative error). An order of dismissal was entered.  <u>See</u> Docs. 10, 11, and 12.

The State was directed to respond to the remaining claims.  It argued, with respect to several of them, that the claims were not properly exhausted because they were not framed as federal claims when presented to the state court.  The AEDPA requires a prisoner in state custody to exhaust his state court remedies before seeking federal habeas relief.  He exhausts a claim by properly presenting it,  either on direct appeal or post-conviction application, all the way to the state's highest court. <u>Busby v. Dretke</u>, 359 F.3d 708, 723 (5th Cir.2004). One aspect of exhaustion requires that the claim be presented to the state court within a federal constitutional framework. <u>Scott v. Hubert</u>, 635 F.3d 659, 667 (5th Cir 2011), citing <u>Baldwin v. Reese</u>, 124 S.Ct. 1347 (2004) (claim in state court petition for ineffective assistance of appellate counsel not exhausted because not identified as federal in nature). The determination of whether the claim was presented in such a fashion is made by looking to the briefs filed in state court, even if the state court ignored the federal issue in its opinion. <u>Smith v. Digmon</u>, 98 S.Ct. 597 (1978); <u>Soffar v. Dretke</u>, 368 F.3d 441, 467 (5th Cir. 2004).

After the State raised this defense, Petitioner filed a reply (Doc. 28) in which he admitted that "he has failed to raise the federal nature of Claims I, III(B), and IV(A)." Petitioner said that he "now abandons the above issues."   All of Claims III and IV were dismissed earlier based on lack of exhaustion.  With respect to Claim I (which included nine claims under its heading), it appears Petitioner inadvertently agreed to abandon all of those claims; the State did not challenge all of them for failing to present a federal claim. Also, the

court inadvertently omitted Claims I(G), (H), and (I) from mention in the prior order that categorized the exhausted and unexhausted claims, and the State was not asked to respond to them.  Those three issues, which are aimed at trial court procedural rulings, go hand-in-hand with three claims of prosecutorial misconduct listed under the heading of Claim II. Accordingly, the undersigned does not recommend accepting Petitioner's abandonment of all claims under Claim I because he will likely at some point come to the realization he has made a mistake.  Some of the claims were properly exhausted, and others were not, as will be discussed below. It will save time and trouble to address the properly exhausted claims now.

**AEDPA Standard of Review**

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent when it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts.  Pape v. Thaler, 645 F.3rd 281, 287 (5th Cir. 2011).  A state court makes an unreasonable application of clearly established federal law when it identifies the correct

governing legal principle from the Supreme Court's decisions but applies it to the facts in a way that is not only incorrect but objectively unreasonable.  Renico v. Lett, 130 S.Ct. 1855, 1862 (2010).

## Sufficiency of the Evidence

### A.  Exhaustion

Petitioner challenged the sufficiency of the evidence on direct appeal, and his brief relied expressly upon the federal standard announced in Jackson v. Virginia, 99 S.Ct. 2781 (1979).  Tr. 1357-58.  Petitioner also included the Jackson argument in his writ application to the Supreme Court of Louisiana (Tr. 1410-11), as is required for exhaustion.  O'Sullivan v. Boerckel, 119 S.Ct. 1728 (1999).  The State concedes at page 16 of its memorandum that this claim was exhausted, so the court will overlook Petitioner's statement in his reply that he abandons all Claim I issues.

### B.  Jackson

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 99 S.Ct. at 2789.  The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."  Herrera v. Collins, 113 S.Ct. 853, 861

(1993).  The state court's application of <u>Jackson</u> is reviewed under the deferential standard of Section 2254(d). <u>See</u> <u>McDaniel v. Brown</u>, 130 S.Ct. 665 (2010).

### C.  Relevant Facts

Tatum Strogen, age 19, attended a Lil' Flip rap concert at the Expo Hall in Shreveport. It was announced that the performer was not going to arrive until around midnight, so Strogen and her friends went into the parking lot to leave. The lot in question is on the north side of Expo Hall. It fills an area between railroad tracks at the rear/west end of the property and Clyde Fant Parkway at the east end of the property. The Harrah's riverboat casino and hotel were located directly across the parkway.

While in the parking lot, Strogen's group witnessed an argument between Eutychus James (a member of a Crips gang from Shreveport) and Barandle Williams (a member of a Bloods gang from nearby Bossier City).  Members of both gangs stood watching.  One of the Bloods brandished a Tec-9 pistol, but another Blood tried to calm him and the others down, saying there were too many people nearby for anyone to be shooting.

Kevin Capers, also a Blood, fired a single shot into the air.  Members of the Crips gang, who were located on the west end of the parking lot, began firing a number of weapons.  The Bloods were on the east side of the parking lot with their backs toward the casino.  Strogen's group was near the Bloods, ducked down by a  police car.  During a lull in the shooting, Strogen got up and tried to run back inside the Expo Hall through a nearby door. She took only a step or two before a 9 mm bullet struck her in the head, and she fell to

the ground, unresponsive.  She died the next morning.  Police found 40 shell casings after the shooting, with 39 of them on the west side of the lot where the Crips were located.

Chadrick Hullaby, who was granted immunity by the prosecution, testified that he and several of his fellow Crips gang members attended the concert.  Derrick Morris brought an assault rifle, which a police witness identified as an AK-47 style 7.62 x 39mm semi-automatic rifle, with two 30 round magazines taped together, one upside down (known as "jungle style").  Israel Edwards was armed with a 9 mm pistol with an extended magazine, which a police witness identified as a Ruger P-89.  Hullaby testified that he also saw Petitioner with a pistol that night, and he believed it was a 9 mm with a regular (non-extended) magazine and an obliterated serial number.

Hullaby testified that Eutychus James and one of the men from Bossier "passed words," after which one of the other men from Bossier, armed with a pistol (later identified as a Tec-9), walked toward the men.  The armed man then turned around and walked back to a car.  Another occupant of the car (later identified as Kevin Capers) fired a round in the air, and the Crips group began shooting from where they were stationed in the northwest corner of the Expo Hall parking lot.  Morris fired the rifle, Edwards fired the extended-magazine 9 mm, and Petitioner fired the regular-magazine 9 mm.  Hullaby saw Petitioner fire two or three times before Hullaby ducked behind a car.  He estimated that his group fired 20 to 30 shots.  He did not know where Petitioner acquired the pistol he fired.  Hullaby said that he and the others were members of the Crips, but Petitioner was not.

Lorenzo Ealy, also granted immunity, testified that he saw Petitioner shoot toward the Bossier group more than twice, but he was not sure of the number of rounds fired.  He agreed that Israel Edwards was shooting an extended-magazine 9 mm pistol, and Petitioner was firing an ordinary-magazine 9 mm pistol.  He said that Eutychus James was carrying a 9 mm pistol in his front pocket that night, and Petitioner had to have acquired the pistol from James.

Rodreaco Lafitte testified that he owned the Ruger pistol with the extended magazine, but he let Israel Edwards have it the night of the concert.  He said that Derrick Morris had the rifle, and Eutychus James had a black Ruger 9 mm pistol with a regular magazine.  When one of the Bossier Bloods opened his trunk and took out a Tec-9, James gave the Ruger to Petitioner.  Lafitte testified that he did not see Petitioner fire the gun, but he did hear several 9 mm rounds fired that evening.

Police office Van Wray testified that he interviewed Petitioner during the investigation  and took an audio-recorded statement. The recording was played for the jury. Tr. 1133. The tape is not in the record filed with this court, consistent with the general practice of omitting exhibits. The court reporter, per custom, did not transcribe what was said on the video when it was played at trial, and the parties have not pointed to a transcript in the record.  Defense counsel, during cross-examination of  Wray, characterized the statement as Petitioner saying he fired a 9 mm pistol seven or eight times, and the prosecutor specified on

redirect that it was the short-magazine 9 mm. Tr. 1138-39. Petitioner does not contest these characterizations of his statement.[1]

Jotasha Lafitte, Rodreaco's sister, testified that she saw Petitioner and others arrive at their house that evening. Petitioner had a shirt wrapped around his hand.  Derrick Morris told her that he was going to the club and needed to leave some guns that he did not want on him.  Jotasha said that the guns were a chopper (slang for assault rifle), her brother's extended-magazine Ruger, and another black gun.  The guns were hidden in a hot water heater closet.  Calvin Brooks came by the next day and took the rifle and regular-magazine Ruger.  The police later searched the house and found Rodreaco's pistol in an attic space above his bedroom; the extended magazine for it was hidden behind an ventilation vent.

Detective Tom Oster testified that police learned the name of the man who had picked up the other weapons used in the shooting and where he had taken them.  Police were allowed inside a shed, where they found the rifle with two taped-together magazines and the ordinary-magazine Ruger P-85 in a British Knights shoe box. An earlier witness testified that the Crips prefer that brand of shoe because the initials BK are suggestive of Bloods killer.

Richard Beighley, a criminalist at the local crime lab and supervisor of the firearm section, testified that the fatal bullet recovered from the victim was fired by the Ruger P-85 with an obliterated serial number.  He opined that a bullet jacket taken from an awning just

---

[1] The State may wish to supplement the record in this regard with a tape or transcript to remove any doubt. It is always a good idea to include in the habeas record transcripts or tapes of key interviews or statement that relate to a claim or defense.

above where the victim fell was also fired by that pistol.  Beighley compared shell casings produced when he fired the Ruger to those casings found at the scene.  Of 23 9 mm casings found at the scene, 15 of them were fired from the Ruger P-85.  The ordinary-capacity magazine that accompanied that pistol held 15 rounds.

Defense witnesses included Rodney Lewis, who was then incarcerated and had been with the Bossier group that evening.  He said that he saw on the news that Petitioner was charged with the Expo Hall shooting, and he just could not let an innocent man be convicted when he had seen the shooter.  Lewis claimed that he was running during the shooting and, if he had not fallen, it would be him instead of the victim who was shot.  He said the shooter was Broderick Johnson, whom he knew to be a troublemaker who is violent with a gun. Lewis admitted on cross-examination that he did not mention this to police when he was questioned the day after the shooting.

Eutychus James testified for the defense.  He denied that he or any of the other men involved in the incident were members of a gang, although he admitted throwing gang signs and taking photographs doing so shortly before the shooting.  He claimed that he was armed that evening with a chrome-handled weapon that he took from Calvin Brooks' car.  He identified one of the exhibits as being that weapon, and the prosecutor said that it was a .380 caliber pistol.  James said that when the shooting started, Petitioner "took the chrome gun out of my pocket and started back - - shooting back for his life."

James admitted on cross-examination that he had been a cell mate with Petitioner for about three months before the trial.  He said they never discussed the case during that time,

and they just "put it in the Lord hands."  On rebuttal, the State played a video tape of James' statement to an investigator eight days after the shooting.  The tape is not in the record filed with this court, consistent with the general practice of omitting exhibits. The court reporter, per custom, did not transcribe what was said on the video when it was played at trial, and the parties have not pointed to a transcript in the record.  The prosecutor, in closing argument, said that James said on the tape, two or three times, that Petitioner was shooting a Ruger that night. Tr. 1287. The state appellate court wrote that James's earlier statement "directly contradicted his testimony at trial."  Petitioner does not contest these characterizations of the taped statement. The State may wish to supplement the record in this regard with a tape or transcript to remove any doubt.

### D.  Analysis

Second degree murder is defined by La. R.S. 14:30.1 as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.  It is not necessary that the defendant intended to kill or harm the actual victim. Under the concept of transferred intent, a defendant who shoots at one person or group of persons with the specific intent to kill or harm them is guilty of second degree murder if his bullet "unintentionally" kills a person he did not intend to harm. State v. Williamson, 805 So.2d 1235, 1240 (La. App. 2d Cir. 2002). See also State v. Gilliam, 827 So.2d 508, 515-16 (La. App. 2d Cir. 2002) (applying transferred intent in first degree murder case).

The state court cited the appropriate Jackson standard and reviewed the evidence.  It noted evidence in the form of Petitioner's statement, the testimony Rodreaco Lafitte, and the

statement by Eutychus James to investigators, all of which put the Ruger with the ordinary magazine in Petitioner's hands.  Petitioner admitted firing several times, and scientific evidence linked the fatal bullet to the gun he fired.  Several witnesses described the scene and where each participant was stationed.  That testimony, together with the recovered casings from fired rounds, placed Petitioner at the northwest corner of the Expo Hall, where he could have easily moved behind the large Hall and avoided exposure to any shots fired from the east end of the lot. The victim was shot almost straight ahead of that position, as if Petitioner fired down the path of a sidewalk that runs along the north side of the building, near an entrance at the northeast corner of the building.  The fatal round entered the victim's head on the right side and traveled to the left, consistent with being fired from Petitioner's area, and inconsistent with being fired from the Bloods who would have been to the left of the victim. The state court found this, and the other evidence discussed by it, sufficient to allow a reasonable juror to find Petitioner guilty.  State v. McKinney, 890 So.2d at 739-41.

Petitioner paints the State's evidence as suggesting Petitioner must have fired the Ruger with the obliterated serial number merely because others were firing the other recovered weapons fired at the scene.  He also points to the trial testimony of Eutychus James that Petitioner fired a chrome pistol, not the black Ruger murder weapon. There was, however, direct evidence, including Petitioner's own words, that put the murder weapon in his hands.  There may have been some conflicting evidence, but the jury was permitted to assess the credibility of the various witnesses and reasonably determine that Petitioner fired the murder weapon.  Petitioner also faults the lack of fingerprint or DNA evidence to tie him

to the gun, but that is not necessary for the prosecution to meet its burden.  The state court applied the correct legal principles from <u>Jackson</u>, and it did so in a reasonable manner. The murder conviction, under the deferential AEDPA standard, is not subject to being overturned for insufficient evidence.

**Principals; Self-Defense**

Petitioner's Claim I(A) contends the trial court erred when it instructed the jury "as to the law of principals and in the manner in which the self-defense instruction."  The jury instructions on these issues were challenged on direct appeal, but the argument was made based solely on state law, with no reference to federal constitutional law or as suggestion that the arguments raised a federal issue.  Tr. 1352-55.  The State objected that Petitioner did not satisfy the exhaustion requirement by alerting the state courts to the federal nature of the claim. Petitioner then abandoned all of Claim I.  This Claim I(A) was properly abandoned due to the lack of proper exhaustion of a federal claim.

**No Negligent Homicide Instruction**

Petitioner argued on direct appeal that the trial judge should have instructed the jury regarding a lesser charge of negligent homicide.  The argument was framed solely in terms of state law.  Tr. 1355-56.  Petitioner's argument to this court once again presents the issue solely in terms of state law.  The State responded that Petitioner did not properly exhaust a federal claim with regard to this issue.  Petitioner properly abandoned this claim.

**Change of Venue**

Petitioner's counsel filed a one-paragraph motion for change of venue in which he generally suggested the change was necessary because of "great and widespread publicity" in the media about the arrest and Petitioner's indictment. Tr. 77.  The minutes indicate that the motion was argued and denied (Tr. 5), but the State has not pointed to a transcript of that hearing. The issue was not raised on direct appeal, likely explaining the absence of a transcript. Petitioner raised the issue again in a post-conviction application, where he cited federal decisions regarding when prejudice requires a change of venue.  Tr. 1443-45.  The trial court denied the claim, noting that Petitioner cited no facts to support his claim of prejudice. Tr. 1498-99.  The state appellate court agreed that the issue was meritless because Petitioner had not demonstrated that there was such prejudice in the collective mind of the community that a fair trial was impossible.  Tr. 1518.  The Supreme Court of Louisiana denied writs without comment.  Tr. 1526.

The State, in response to the habeas petition, argued that this claim was not properly exhausted because the motion did not cite any federal authority.  The bare-bones motion did not cite any authority, but it is not known what legal arguments may have been made at the trial court hearing.  Petitioner did present this claim as a federal one in his post-conviction application, so the court will overlook Petitioner's abandonment of this Claim I issue.

Extensive knowledge in the community of either a crime or the accused criminal is not sufficient by itself to render a trial constitutionally unfair.  Even if there is such awareness in the community, prejudice will not be presumed unless there is a trial atmosphere utterly corrupted by press coverage.  Dobbert v. Florida, 97 S.Ct. 2290 (1977).

The petitioner is ordinarily required to show that particular jurors actually selected for service were biased against him.  Busby v. Dretke, 359 F.3d 708, 725 (5th Cir. 2004), citing Mayola v. Alabama, 623 F.2d 992, 996 (5th Cir. 1980).

Petitioner has not pointed to any evidence presented to the trial court that would establish publicity or resulting bias against him.  The voir dire was transcribed and is in the record, but Petitioner has not directed the court to any portions of that record that would suggest constitutional unfairness as to the method of jury selection or the character of the jurors actually selected.  Habeas relief is not available on this claim unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d). The above discussion shows that the state court's rejection of this issue was entirely correct.

**Trial Notebook**

Petitioner asserts in Claim II(A) that the prosecutor improperly gave the jurors a trial notebook that contained photographs and other exhibits.  He presents a parallel Claim I(G) argument that the trial court abused its discretion by allowing the use of the trial notebook. For the reasons that follow, the claims do not merit relief from the conviction.

This was a trial with many exhibits and witnesses, and the prosecutor attempted to make it easier for the jury to follow the case by preparing an exhibit book for each juror that contained photographs of several of the witnesses, photographs of the crime scene, and other exhibits.  Defense counsel objected pursuant to La. C. Cr. P. art. 793, which prohibits a juror

from taking notes in a criminal case unless the defendant and the State consent.  Absent such consent, a juror must rely upon his memory in reaching a verdict, and he "shall not be permitted to refer to notes or to have access to any written evidence."  Defense counsel objected that the notebook (1) essentially provided the jurors notes in the form of the names and brief descriptions that accompanied some of the photographs and (2) allowed jurors access to material not yet introduced into evidence.  The trial judge allowed the prosecutor to use a marker to black out the text that accompanied the photos, but defense counsel said that some of it was still legible.  The prosecutor agreed that each exhibit would be properly identified, authenticated, and admitted through the testimony of a witness before the jurors would be directed to open their notebook to the exhibit.  Tr. 432-42, 503-08.

Petitioner did not raise this issue on appeal but did renew it in his post-conviction application.  The trial judge denied the claim with the observation that the exhibits in the notebook were not viewed by jurors until the exhibits had been admitted.  Tr. 1499-1500.  The state appellate court stated that any "claims relating to prejudice resulting from the use of a trial notebook are not supported in this application."  Tr. 1518.

The habeas statute allows a federal court to issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody and in violation of the Constitution or laws or treaties of the United States.  The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law."  Swarthout v. Cooke, 131 S.Ct. 859, 861 (2011).  Accordingly, any violation of La. C. Cr. P. art. 793 is not a basis for relief.

Petitioner cites in his petition U.S. v. Rana, 944 F.2d 123 (3rd Cir. 1991), which held the district court erred by allowing jurors to possess similar notebooks prior to introduction of the exhibits despite an admonition to the jury not to look at the exhibits before they were told to do so. The Third Circuit was of the opinion that the practice tempted fate, and a juror was likely to accidentally or out of curiosity look at an item that might turn out to be inadmissible.  The Court did not suggest the rule was of constitutional magnitude or cite a Supreme Court case that clearly establishes such notebooks may not be used.  It did hold, in the end, that there was no prejudice, because the two exhibits viewed prematurely were both later admitted into evidence.  See also U.S. v. Akpan, 407 F.3d 360, 368 n. 13 (5th Cir. 2005) (citing cases involving the use of notebooks).

Petitioner argues, despite the findings of the state court, that there were instances when a juror turned to the wrong page or otherwise looked at an exhibit before it was admitted.  Petitioner has not, however, identified any such exhibit that was (1) not later admitted and (2) prejudicial.  Most important, he has not demonstrated how the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.  Accordingly, Section 2254(d) does not allow habeas relief on this claim.

**Leading Questions**

Petitioner argues in Claim II(B) that the prosecutor asked leading questions throughout the trial, and he presents as Claim I(H) an argument that the trial court erred in allowing such leading questions.  Petitioner cites as examples of such improper questions,

"Do they run north and south?," when questioning a witness about railroad tracks shown on a photo (Tr. 555); "And that shows the damage that was done when the black car hit it?," when questioning a police officer about a photograph of a patrol car (Tr. 643); and "Now, after you heard this loud talking, you turned your attention back to the ladies you were with?," when questioning an innocent bystander who was shot while sitting outside the Harrah's Casino across the street.

This issue was raised on post-conviction application.  The trial judge stated that leading questions were handled by objection, followed by a bench discussion, and often a rephrasing of the question.  She also noted that questions calling for a yes or no answer are not impermissible when they do not suggest the answer to the witness, and nothing in Petitioner's application indicated how the questions diminished the reliability of the verdict. Tr. 1500-01.  The state appellate court found no merit in any of the claims of prosecutorial misconduct.  Tr. 1518.

Prosecutor misconduct does not provide a basis for habeas relief unless it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 106 S.Ct. 2464, 2471 (1986).  The petitioner must also demonstrate prejudice by showing that the misconduct was so persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction would not have occurred but for the improper remarks.  Geiger v. Cain, 540 F.3d 303, 308 (5th Cir. 2008), citing Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988). See Braswell v. Dretke, 2004 WL 2583605, *12 (N.D. Tex. 2004) (applying the Darden standard to a complaint of prosecutor asking leading questions).

Petitioner has not identified any leading question that generated evidence of guilt that would not have been introduced otherwise, or that was prejudicial in any significant way. Any error of state law with regard to asking leading questions is not grounds for habeas relief. No relief is permitted on this claim.

**Hostile Witness**

Plaintiff argues in Claim II(C) that the prosecutor wrongfully established witnesses as hostile, and he argues in Claim I(H) that the trial court erred in allowing such treatment. Louisiana Code of Evidence article 611 provides that interrogation may be by leading questions when a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, or a witness identified with an adverse party.  Petitioner complains that Rodreaco Lafitte was treated as a hostile witness despite lack of grounds. When this was presented in a post-conviction application, the trial judge held that Lafitte was hesitant in responding to some of the questions, so it was established that he was a hostile witness.  She added that there was no indication the prosecutor's questions led the witness to present any false suggestions, and the questions were followed by a very thorough cross-examination.  Tr. 1501.

Once again, federal habeas relief does not lie for errors of state law, such as an alleged misapplication of Article 611.  Petitioner does not cite a Supreme Court decision that clearly establishes a principle that might have been violated with respect to this issue, and none come readily to mind.  Relief is not warranted.

**Opinion Evidence**

Petitioner presents as Claim II(D) an argument that the prosecutor improperly asked opinions of lay witnesses.  The only such witness identified by Petitioner is Shreveport police Corporal Tommy Rachal, then employed with the Department for more than nine years and with the crime scene investigation unit for more than three years.  Petitioner complains that Rachal provided opinion testimony regarding ballistics, trajectory, and flight path of projectiles without being offered as an expert.  Petitioner does not, however, identify any particular testimony to which he objects.

The trial court, when this issue was presented on post-conviction application, noted that Rachal testified to support admission of a videotape of the crime scene and photographs of various items related to the investigation.  Defense counsel did not object to any opinions that were given, and he conducted a rigorous cross-examination in which Rachal admitted that he did not know where some of the projectiles went, did not know the caliber of the various projectiles, the weapon used to fire them, or the timing or sequence of firing.  She concluded that none of Petitioner's substantial rights were affected through the testimony. Tr. 1502.

The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003), citing Dawson v. Delaware, 112 S. Ct. 1093 (1992) and Estelle v. McGuire, 112 S.Ct. 475 (1991). The evidence must have had a substantial and injurious effect or influence in determining the jury's verdict. Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007).

The only opinion testimony offered by Rachal was, for example, with respect to his photograph of the location of lead fragments found on the west-facing front of the Harrah's casino.  The prosecutor asked Rachal if, in his opinion, the projectile was fired from west to east, and he answered yes.  Practically speaking, that was the only reasonable conclusion.  The question hardly needed asking, and the issue was not significant with respect to the guilt or innocence of Petitioner.  This and similar questions do give rise to the level of prejudice that would be required to overturn the conviction.

**Conclusion**

The court has now addressed each of the issues raised in Petitioner's habeas petition.  Many of the claims were dismissed voluntarily before this review, and others have since been found to be not properly exhausted.  Many of the claims that were reviewed on the merits were essentially state law arguments about evidence rules and trial procedure, which are not grounds for federal habeas relief.  Some of those claims were nonetheless reviewed on the merits with an eye toward the deferential AEDPA requirements. None of the claims were found to permit habeas relief from the conviction.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus be denied.

**Objection**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within seven (7) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 14th day of March, 2012.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE